IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT JEAN HUDSON, | § | |
| *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | No. 3:03-CV-01643-K |
| NATHANIEL QUARTERMAN, Director, | § | ECF |
| Texas Department of Criminal Justice | § | (Death Penalty Case) |
| Correctional Institutions Division, | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Robert Jean Hudson, sentenced to death for capital murder, petitions the Court for writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his conviction and sentence are unconstitutional in several respects. The Court denies Hudson's petition for writ of habeas corpus.

## I. HISTORY OF THE CASE

A jury convicted Hudson of capital murder and his punishment was assessed at death by lethal injection in the 165th Judicial District Court of Smith County, Texas. (Clerk's Record ("CR") at 32-35). On March 6, 2002, the Texas Court of Criminal Appeals affirmed both the conviction and the death sentence in an unpublished opinion. *Hudson v. State*, No. 73,826 (Tex. Crim. App. March 6, 2002) (per curiam). Hudson did not petition the Supreme Court for a writ of certiorari. Hudson filed an application for state post-conviction relief during the pendency of his state appeal. (*Ex Parte Hudson*, Application No. 56,063-01, State Habeas Transcript ("SH Tr") at 2). On May 23, 2002, the trial court issued an order adopting the State's proposed findings and denied Hudson's application. (SH Tr at 344). On July 2, 2003, the Court of Criminal Appeals issued an order adopting the trial court's recommendation. *Ex Parte Hudson*, No. 56,947-01 (Tex. Crim. App. 2003). On June 30,

2004, Hudson filed the instant action in federal court. (Doc. #17). Throughout the remainder of this opinion, except as otherwise noted, the Court will refer to the "state habeas court" as a single tribunal.

## II. STANDARD OF REVIEW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because Hudson filed the instant petition after its effective date, the Act applies to his petition.

Title I of the AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by the AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). In this case, the denial of Hudson's state writ constitutes an adjudication on the merits. *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial, rather than a dismissal, signifies an adjudication on the merits). The Texas Court of Criminal Appeals also considered the merits of

Hudson's claims raised on direct appeal. Thus, the AEDPA standards enumerated in 28 U.S.C. § 2254(d) apply.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established Federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* states that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed

unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has held that, when claim was dismissed by a state court pursuant to an independent and adequate state procedural rule, federal habeas review of that claim is barred unless the prisoner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law *or* that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995).

Hudson urges this Court not to apply the presumption of correctness normally accorded the state court's findings of fact, and instead to analyze his claims under the *de novo* standard of review. He claims that the state habeas court did not properly "adjudicate" his claims as required by 28 U.S.C. § 2254(d) because it adopted verbatim the State's Proposed Findings of Facts and Conclusions of Law without granting Hudson's request for a hearing and without requiring "'affidavits, depositions and [or] interrogatories' to resolve any of the factual allegations raised by Hudson, as allowed by Texas law." (Pet. Brief at 22). The Court finds no merit in Hudson's assertions on this point.

The presumption of correctness prescribed by 28 U.S.C. § 2254 (d) for federal courts reviewing state habeas court findings of fact is not affected by whether the state habeas court elects to hold oral hearing. *Carter v. Johnson*, 131 F.3d 452, 460 n .13 (5th Cir.1997); *see also Trevino*

*v. Johnson*, 168 F.3d 173, 180 (5th Cir.1999) (finding that the state habeas court's adoption of the prosecution's proposed findings of fact and conclusions of law three hours after they were filed with the court did not give rise to a claim for violation of petitioner's due process rights); *James v. Collins*, 987 F.2d 1116, 1122-23 (5th Cir.1993) (presumption of correctness is further strengthened if the judge who presided at the petitioner's trial issues the written findings). Accordingly, the Court will apply the standard of deference prescribed by the AEDPA.

### III.  FACTUAL BACKGROUND

The Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> During the late-night hours of May 6, 1999, the appellant [Hudson] called his ex-girlfriend Edith Kendrick and told her he was going to her apartment. Shortly after midnight, he arrived at Kendrick's second-floor, efficiency apartment and knocked on her door. There was no answer. The appellant began yelling and kicked in the door. Just inside the door were a couch and a bed. When the door opened, the appellant saw Kendrick standing next to the bed and a man running from the couch pulling up his pants. Kendrick moved in front of the appellant to keep him from going after the man.

> According to the appellant, he grabbed a black-handled buck knife from the bed and began swinging at Kendrick. When Kendrick's eight-year-old son Colby got between the appellant and his mother, the appellant pushed him toward the stairs and followed him down, telling him to leave. The appellant then went back upstairs and saw Kendrick lying on the balcony with her eyes open. Believing Kendrick dead, the appellant walked away from the scene, dropping the knife along the way. As he was leaving, the appellant realized he had Kendrick's watch in his hand. He pocketed the watch, speculating that he grabbed it during the fight. The appellant was arrested at a nearby convenience store.

> After his arrest, the appellant gave the authorities a written statement about these events. The appellant also noted in his statement that he never intended to hurt Kendrick or Colby, but that "something came over [him]" when he got to the apartment and Kendrick would not talk to him or try to work things out between them.

5

When police investigated the scene further, they noticed an open purse on the blood-covered couch. Michael Spearman, the man who was in the apartment when the appellant broke in, told the police that Kendrick's purse, which had money and a newly-purchased watch in it the evening before, had not been on the couch and that no knife had been on the bed prior to appellant's arrival. Spearman also told the authorities that he was on Kendrick's couch when he heard a loud banging door and someone threatening to come in and kill them. The appellant then kicked in the door and entered the apartment with a knife in his hand, at which time Kendrick told Spearman to leave. Spearman went out a second exit and down to a pay telephone where he called "911." As Spearman was calling for help, Colby came running outside and said that the appellant had killed his mother and tried to kill him, too.

Michael Munoz testified at trial that he witnessed the murder while sitting in his car in the apartment parking lot. He told the jury that he saw Kendrick come crashing out of her apartment onto the balcony, with the appellant following immediately behind. The appellant grabbed Kendrick's hair, pulled her backwards, and stabbed her at least six times, raising his hand as high as he could each time. When the appellant was processed at the jail, authorities removed a ladies' wrist watch from his pocket as well as about $275.00 which had blood on it.

*Hudson*, slip op. at 2-3 (footnotes omitted).

## IV. <u>ISSUES PRESENTED</u>

Hudson claims as follows: (1) that his right to effective assistance of counsel was violated by the failure of his trial counsel to investigate and present mitigation evidence at either phase of trial (Claim #1) , (2) that the State's failure to disclose favorable evidence to Hudson denied him effective assistance of counsel and subjected him to cruel and unusual punishment (Claim #2), (3) that Hudson was medicated against his will and was thus denied the effective assistance of counsel as well as confrontation rights and due process (Claim #3), (4) that his trial counsel's failure to object to the State's voir dire on parole laws denied him effective assistance of counsel (Claim #4), (5) that he was denied effective assistance of counsel by his appellate counsel's failure to raise the issue on appeal that Hudson's trial counsel had failed to object to the State's voir dire on parole laws (Claim #5), (6) that the trial court's parole law instruction violated the Eighth and Fourteenth Amendments

(Claim #6), (7) that Hudson's appellate counsel denied him affective assistance of counsel by failing to object on appeal that the trial court's parole law instruction violated the Eighth Fourteenth Amendments (Claim #7), (8) that the trial court's jury instructions failed to define vague terms in special issues, in violation of Hudson's due process rights as well as his Eighth and Sixth Amendment rights (Claim #8), that the Texas Due Process statute, which fails to inform jurors that lack of a unanimous verdict on sentencing results in a life sentence is cruel and unusual punishment and violates Hudson's due process rights (Claim #9), (10) that the jury selection process did not result in a representative cross section of the community (Claim #10), and (11) cumulative error (Claim #11). Hudson also makes an alternative request for an evidentiary hearing.

## V. EXAMINATION OF GROUNDS FOR RELIEF.

### A. Ineffective Assistance of Counsel (Claim #1).

In his first ground for relief, Hudson claims that his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to properly investigate and present evidence favorable to Hudson during trial. (Pet. Brief at 13-22). Specifically, Hudson complains that his trial counsel failed to call any witnesses on Hudson's behalf during either phase of his trial (guilt-innocence or punishment). (Pet. Brief at 13).

At the punishment phase of Hudson's trial, the State introduced two witnesses – a fingerprint technician who introduced evidence of Hudson's prior offenses (21 RR 76-81) and a woman worked at the jail commissary who testified that she witnessed Hudson exposing himself and masturbating in front of her while he was incarcerated pending his trial. (21 RR 81-87). Hudson's defense counsel cross examined both of the prosecution's witnesses, but did not introduce any witnesses on Hudson's behalf. The record reflects that Hudson agreed with the decision not to offer any testimony

at the punishment phase. (21 RR 89-91).

In his petition brief, Hudson argues that his trial counsel's failure to investigate and to call certain persons to testify on his behalf denied him effective assistance of counsel. The persons identified by Hudson include two relatives who were present at his trial – Clyde Crawford, Hudson's half-brother, and Doris (Ruth) Walker, Hudson's cousin (Pet. Brief at 13, Exh. C, D), as well as Hudson's father, Emmitt Williams, who was incarcerated during his trial (Pet. Brief at 13-14, Exh. E), and finally, Lillie Walker, another relative of his, who Hudson claims was familiar with his background but who was not contacted by his trial counsel during trial preparation. (*Id.*, Exh. F).

Hudson admits that his trial counsel contacted Crawford and Walker, but complains that his counsel did not properly interview them. (*Id.* at 14). According to Hudson, if his counsel had interviewed them, these two witnesses would have provided "detailed knowledge Petitioner had a close rather than estranged relationship right up to the point of her death," and that such information "would have added additional credibility to the position of Hudson's counsel, that far from being a cold calculated act, the murder of the victim occurred in a jealous rage." (*Id.*).

Hudson also states in his own affidavit that he began receiving mental health treatment for anger control at an early age, and argues that the affidavits of Doris Walker, Lillie Walker and Hudson's father confirm this. (*Id.* at 15, Exh. G). Finally, Hudson also reports in his affidavit that he had little contact with his father from a young age and that after being raised by his great-grandparents until about the eighth grade, he then went to live with his mother "in a less stable home environment." (*Id.* at 15; Exh. G). Hudson argues that all of this evidence, taken together, would have provided the jury with "a keen insight into Petitioner's upbringing and background." Hudson fails, however, to indicate what sort of effect that insight would have on the jury's ultimate decisions.

The Sixth Amendment to the United States Constitution provides criminal defendants a right to effective assistance of counsel during trial. U.S. Const. art. VI. To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, Hudson must demonstrate (1) that his counsel's performance was deficient and (2) that his counsel's deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, Hudson must show "that there is a reasonable probability that, but for [his] counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is sufficient to undermine confidence in the outcome." *Id*. at 694. If Hudson's fails to establish either prong of *Strickland*'s test, the Court must find that his counsel's performance was not below constitutional standards. *Id.* at 696. In analyzing Hudson's claim, the Court must "indulge a strong presumption that [Hudson's] counsel's conduct falls within the range of reasonable assistance." *Id.* at 689.

On direct appeal, the state habeas court rejected Hudson's claim, finding that his "[trial] counsel's decision not to present evidence at the guilt phase was [a] deliberate, reasonable trial strategy," and that Hudson "failed to sustain his burden to prove otherwise." (SH Tr at 267, (#76)). Examining the extrinsic evidence Hudson offered, the state habeas court found it "unpersuasive in proving that his trial counsel were ineffective for choosing not to introduce evidence at the punishment phase," (*Id.* at 279 (#102)), noting that the record demonstrated that Hudson's counsel's decision was "a strategic one" (*Id.* (#103)). *See also id.* at 280-81 (#104-105). The state habeas court specifically noted that Hudson had agreed with his counsel's decision not to call any witnesses on his behalf, (*id.* at 279-281 (#102-105)) as well as the facts that two of the affiants Hudson relies upon were incarcerated at the time they signed their affidavits and that all of the affiants identified

by Hudson were likely biased given their relationships to Petitioner. (SH Tr at 275 (#93)). The state habeas court found that Hudson's trial counsel was aware of the potential information available from the affiants Hudson identifies but made the strategic decision not to introduce it during Hudson's trial, instead focusing on portraying Hudson's crime against Kendrick as a crime of passion. (*Id.* at 276-77 (#95), *see also generally*, 277-289). The state habeas court specifically found that Hudson's mitigation evidence was "minimal in its quality and volume" and that it did not "present a sympathetic case for mitigating a death sentence." (SH Tr at 292 (#135)). The state habeas court concluded that the mitigation evidence actually indicated Hudson's family life was fairly stable during his youth. (SH Tr at 292 (#136)).

The Court finds that the state habeas court's conclusion that Hudson was not able to demonstrate prejudice was not an unreasonable application of the *Strickland* standard. Hudson has not shown prejudice because he has failed to establish a reasonable probability that, had his counsel presented the testimony of the various family members mentioned, the result in the trial would have been different. Hudson therefore is not entitled to any relief on his claim of ineffective assistance of counsel, and his first claim for relief is therefore denied.

## B. *Brady* Claim (Claim #2).

In Hudson's second claim, he contends that the was denied his Sixth Amendment right to the effective assistance of counsel and was subjected to cruel and unusual punishment in violation of the Eighth, Sixth and Fourteenth Amendments as a result of the State's failure to disclose favorable evidence to him, in violation of the standards set forth in *Brady v. Maryland*, 373 U.S., 83 (1963). (Pet. Brief at 23-25). Specifically, Hudson claims that a prosecution report which would have "minimized the impact" of Hudson's conviction for murder in 1987 was not made available to his

trial counsel or to his state writ counsel, but was only turned over to Hudson's writ counsel as an attachment to the State's response to Hudson's state writ. (Pet. Brief at 24).

Respondent contends that Hudson's second claim is unexhausted because Hudson failed to present it to the state courts, and therefore it is now procedurally barred. (Answer at 16-19). In the alternative, Respondent argues that Hudson's claim is foreclosed by Fifth Circuit precedent. (*Id.*). The Court will first address the potential procedural bar to Hudson's claim.

Texas law precludes successive habeas claims except in narrow circumstances. *See* TEX. CRIM. PROC. CODE ANN. art. 11.071 § 5 (Vernon Supp.2006). Under § 5, unless Hudson presents a factual or legal basis for a claim that was previously unavailable or shows by a preponderance of the evidence that, but for a violation of the United States Constitution, no rational juror would have found for the State, Hudson is procedurally barred from returning to the Texas courts to exhaust his claims. *Id.* Art. 11.071 § 5 of the Texas Code of Criminal Procedure provides, in part, that

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> > (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> > \* \* \*
>
> (e) For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date.

To satisfy this requirement, it is not enough to show that Hudson was ignorant of such claim, or that it was not an issue in a prior hearing. *See Ex parte McGinn*, 54 S.W.3d 324, 332 (Tex. Crim. App. 2000). Construing this requirement, the Texas Court of Criminal Appeals has stated

> What the statute requires is not that the availability of facts be "questionable." It requires that the application contain specific facts establishing that the current claim could not have been presented previously in a timely initial application because the factual basis for the claim was unavailable.

*Id.* at 333. Hudson has not satisfied this requirement.

Hudson claims that the prosecution report was for the first time made available to Hudson's writ counsel in response to his state writ. (Pet. Brief at 24). But Hudson does not assert that his counsel, at any stage in the proceedings, was unaware of the nature of Hudson's participation in the murder for which he was previously convicted, nor that his counsel was unaware of the prosecution report. Hudson has not attached any declaration by his trial counsel or writ counsel referencing the evidence which was allegedly kept from his attorneys. Moreover, Hudson provides no information regarding his own knowledge of the facts relating to his previous conviction. There is no information before this Court indicating that the allegedly suppressed information was not available to Hudson or his attorneys at the time of his trial. Based on the allegations contained in his petition, Hudson could not satisfy this exception and would be barred from making this claim in a successive state habeas corpus petition. Therefore, he is also procedurally barred from proceeding with this claim in federal court. *See Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. at 735 n.1). Hudson does not assert any other reason to excuse him from any procedural default barring this claim from federal habeas corpus review. *See Beazley*, 242 F.3d at

264. (holding that failure to exhaust results on procedural default without demonstrated "cause" and "prejudice.").

Accordingly, it appears that Hudson would be precluded by Texas law from returning to state court to exhaust his remedies in a successive petition in state court. *See Beazley*, 242 F.3d at 264. Thus, Hudson's second claim for relief is unexhausted and procedurally barred. Out of an abundance of caution, however, and because § 2254(b)(2) provides that a petitioner's "application for a writ of habeas corpus may be denied on the merits, notwithstanding [his failure] to exhaust the remedies available in the courts of the State," the Court will also analyze Hudson's second claim on the merits. In Hudson's second claim, he contends that he was denied his Sixth Amendment right to the effective assistance of counsel by the State's failure to disclose information regarding his prior murder conviction, which, according to Hudson, tended to "cast considerable doubt on [his] true guilt for [Hudson's 1987 murder conviction] or, at the very least would have minimized his role in the offense." (Pet. Brief at 23-25). As mentioned previously, Hudson claims that this information was not made available to his counsel until it was attached to the State's response to Hudson's state Habeas writ. (Pet. Brief at 23). Hudson also claims, without further discussion, that the State was in possession of information regarding medication Hudson was prescribed during his stay at the Dallas County jail which would have shown that he "suffered from mental distress" and that this information likewise was not provided to Hudson's trial counsel by the prosecution. (*Id.*).

Under *Brady*, it is the State's duty to disclose all evidence favorable to a criminal defendant. *See Brady*, 373 U.S. 83, 87; *Edmond v. Collins*, 8 F.3d 290, 293 (5th Cir.1993). Hudson, a habeas petitioner seeking to establish a *Brady* violation before this Court, must prove that the evidence allegedly suppressed by the prosecution was both favorable to him and also material to either the

guilt-innocence or punishment phase of his trial. *Edmond*, 8 F.3d at 293; *United States v. Jackson*, 978 F.2d 903, 912 (5th Cir.1992). Evidence is only material if the Court finds that there is a reasonable probability that the outcome of Hudson's trial would have been different if the allegedly exculpatory material been disclosed by the State. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Andrews v. Collins*, 21 F.3d 612, 626 (5th Cir.1994).

At the outset, the Court notes that Hudson has not established that the State suppressed the evidence, which is the factual basis for his claim. Hudson does not allege that the evidence was not available to him through means other than production by the State. The Fifth Circuit has held that "evidence is not 'suppressed' if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it." *United States v. Runyan*, 290 F.3d 222, 246 (5th Cir. 2002). During Hudson's trial, his defense counsel alluded to his's lesser role in the previous murder for which he was convicted, commenting on his short five year sentence. (SH Tr at 310 (#204), 312 (#213)). Moreover, the trial court specifically noted that Hudson's jail records reference his conviction for "driving murderer from scene." (SH Tr at 310 (#203)). Hudson also makes reference to a second *Brady* claim pertaining to his medication. (Pet. Brief at 23). In its findings, the state habeas court specifically found that Hudson voluntarily took medication and that he informed his attorneys of that fact. (SH Tr at 304 (#181-84)). Because Hudson has not shown that the prosecution kept exculpatory information from him that was not available to him through other means through the exercise of reasonable diligence, his claim under *Brady* fails. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (citations omitted) ("When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation.").

Even if Hudson had proven that the prosecution committed a *Brady* violation, which he has not, his claim nevertheless fails because Hudson has not and cannot demonstrate that the allegedly suppressed information was material to either his guilt or innocence. First, regarding the allegations of suppressed evidence regarding Hudson's mental duress, Hudson has failed to even allege facts in support of that claim. Second, regarding the allegedly suppressed prosecution report, Hudson has failed to demonstrate how the State's failure to turn over a report regarding Hudson's role in the murder for which Hudson himself was previously convicted is material to either stage of his trial for the murder of Ms. Kendrick. *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) (noting that there is "'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.") (citing *Moore v. Illinois*, 408 U.S. 786, 795 (1972)). Hudson has introduced no evidence of materiality to support his *Brady* claim. Accordingly, Hudson's second claim for relief is denied on the merits. *See, e.g. Barnard v. Collins*, 958 F.2d 634, 642 n. 11 (5th Cir.1992).

### C. Involuntary Medication Claim (Claim #3).

In Hudson's third claim for relief, he contends that he was deprived of effective assistance of counsel and denied his confrontation rights as well as due process of law in violation of the Sixth and Fourteenth Amendments by the administration of medication to him by the Dallas County Sheriff's Department during the time his period of incarceration before and during his trial. (Pet. Brief at 26-27, Pet. Exh. G, H). Hudson argues that "[s]ince the drugs administered to [him] were prescribed by agents of the State of Texas out of perceived medical necessity they were, in effect, administered involuntarily" and that "due process forbids the state from medicating a criminal defendant involuntarily absent a showing that the undesired medication is necessary and medically

appropriate." (*Id.* (citing *Riggins v. Nevada*, 504 U.S. 127 (1992)). Hudson further claims that he was deprived of his right to be present at his own trial, relying upon *Illinois v. Allen*, 397 U.S. 337, 338 (1970) for the proposition that "[t]he principal value served by a criminal defendant's presence during his trial is his ability to give advice and suggestions during the course of the trial and to be sure that his attorney presents a vigorous defense." (Pet. Brief at 26-27).

In *Riggins*, the Supreme Court held that held that the trial court had erred in ordering that the defendant be administered antipsychotic drugs during his trial over his objection without first making factual findings that (1) there were no less intrusive alternatives available, (2) that the medication administered by the state was medically appropriate, and (3) that the medication was essential for the sake of defendant's safety or the safety of others. *Riggins*, 504 U.S. 127, 135-36 (1992). Hudson claims that the State's administration of medication to Hudson violated his due process rights under *Riggins*. Respondent contends that Hudson's claims are meritless because he has failed to establish either that he was forced to take any medication against his will or that the medications he took caused him any harm. The Court agrees.

First, the Court agrees with Respondent that it is questionable whether involuntary medication is even cognizable in the habeas context. (Answer at 23-24). *Riggins*, the case Hudson relies upon for this point, was not a habeas case, but rather a direct appeal. *Riggins*, 504 U.S. 127 (1992). The Fifth Circuit in *Richardson v. Johnson*, 256 F.3d 257 (5th Cir. 2001) analyzed a claim brought by a death row inmate for the first time in a successive petition that he was incompetent to be executed and that he was involuntarily medicated by the state for the purpose of being executed. The Circuit court recognized that there were "several difficulties" with the "petitioner's claim of involuntary medication, including whether it is cognizable in habeas." *Id.* at 259. In denying the

16

petitioner's request for certificate of appealability and request for application for stay of execution, the court noted that the state habeas court had previously found that the petitioner had made no showing of involuntary medication (or that medication was given for the purpose of making the petitioner competent for execution). Although Hudson brings his claims in a different context, like the claims of the petitioner in *Richardson*, Hudson's have "no factual legs." *Id.* Hudson has not demonstrated that he was involuntarily medicated, nor does he offer any explanation of how he was affected by the administration of the medication by the state.

The state habeas court specifically considered and rejected Hudson's involuntary medication claim. (SH Tr at 313-325 (#219-69)). In analyzing Hudson's involuntary medication claim, the state habeas court noted that it was Hudson who prompted the state to begin medicating him when he initiated treatment by "complain[ing] to a jail psychiatrist that he was depressed and having trouble sleeping." (*Id.* at 314 (#221-22) (citing Applicant's Writ Exh. A at 2, 10)). Considering Hudson's claims that the medications made him sleepy during his voir dire and trial (Applicant's Writ Exh. G at 4), the state habeas court concluded that Hudson offered "'no extrinsic evidence' of his lethargy or inattentiveness during voir dire or trial." (SH Tr at 318 (#237-38). After reviewing Hudson's psychiatric records dated August 24, 1999, the state habeas court found that the notation "All Meds KOP" in Hudson's records indicated that his medications were "kept on person" – meaning that he was medicating himself while in jail and thus certainly "not being made to ingest antidepressant drugs against his will." (SH Tr at 315-16 (#227)). The state habeas court further found that Hudson had not tendered "any evidence that he made the trial court aware of his desire to discontinue medication, manifested such a desire to jail personnel, or took any other affirmative steps to end his treatment." (SH Tr at 316 (#228)). The court found that because he could not demonstrate that he

was medicated against his will, Hudson was not entitled to relief under *Riggins*. (SH Tr at 314 (#220)).

Separately, the state habeas court addressed Hudson's claim under *Illinois v. Allen* regarding his confrontation rights, the state habeas court made specific factual findings that Hudson "was not only aware of what was going on but was also able to assist his counsel and provide input for his defense" (SH Tr at 323 (#258)), but that he was "present and legally competent throughout the trial and voir dire proceedings." (SH Tr at 322 (#266)).

Hudson has not offered any evidence controverting the findings of the state habeas court, but has merely asserted that the medications were "in effect" involuntarily administered because they were given to him by the state while he was in state custody. (Pet. Brief at 26). The state habeas court's findings regarding the voluntary nature of Hudson's medication as well as the effect of the medication upon his person appear correct from the record and have not been shown otherwise. The state habeas court's denial of this claim was neither unreasonable nor contrary to Supreme Court precedent. Accordingly, Hudson's third claim for relief is denied.

### D. Claims Regarding Parole Law Comments and Instructions (Claims #4, #5, #6 and #7).

Next, in four related claims, Hudson contends that the prosecution violated several of Hudson's Constitutional rights by commenting to and instructing venire persons as well as jurors regarding Texas state parole laws and the possibility of changes in the laws. (Pet. Brief at 28-53). Specifically, Hudson claims (1) that he was denied affective assistance of counsel when his trial counsel failed to object to the State's voir dire on parole laws (Claim #4), (2) that he was denied affective assistance of counsel when his appellate counsel failed to raise the issue identified in Hudson's fourth claim on direct appeal (Claim #5), (3) that the state's instructions to jurors that the

forty year minimum may not apply to Hudson in the future because parole laws might change violated Hudson's rights under the Eighth and Fourteenth Amendments (Claim #6), and finally (4) that Hudson's appellate counsel's failure to raise the issue identified in claim six on appeal denied Hudson of affective assistance of counsel, depriving him of his Eighth and Fourteenth Amendment rights to such a degree that fundamental error occurred (Claim #7).

In his answer brief, Respondent contends that each of each of Hudson's claims 4-7 lacks merit because these claims are foreclosed by precedent and because the prosecutor and the trial court correctly stated the law in speaking to and instructing the jury. The Court agrees.  As discussed previously, Hudson must meet the standards set forth in *Strickland* before he is able to demonstrate that his trial counsel was ineffective.

The Court will first address Hudson's claims four and five, that he was denied affective assistance of counsel when his trial counsel failed to object to the State's voir dire on parole laws (Claim #4) and that he was denied affective assistance of counsel when his appellate counsel failed to raise the issue identified in Hudson's fourth claim on direct appeal (Claim #5).  As set forth in Hudson's petition brief in pages 28-53, he complains about the State's instructions to jurors regarding the mutability of parole laws.  Hudson maintains that the state prosecutor "went far beyond explaining the applicable law, and far beyond attempting to determine whether the venire members could follow the law," when it "stated as a fact to twenty-three venire persons, nine of whom became jurors, that one of the reasons the trial court would instruct the jurors to disregard the 40-year minimum is that the Legislature could at any time change the law, thereby making the 40-year minimum inapplicable to Hudson."  (Pet. Brief at 45).

Hudson asserts that his case may be reversed for ineffective assistance of counsel because his counsel failed to object to statements by the State which argued contrary to the law and invited jurors to disregard the law. *Id.* (relying upon *Burton v. State*, No. 73,204 (Tex. Crim. App. Oct. 25, 2000) (unpublished opinion). He argues that this is significant because nine members of his jury deliberated after the State "encouraged" them to "pretend that the forty-year minimum sentence was meaningless." (Pet. Brief at 45). Hudson asserts that these nine people "could have believed that society would not adequately be protected from Hudson because during his service of a life sentence the law applicable to Hudson might change and allow him to be released before forty years." (*Id.*).

Hudson argues that his trial counsel's "failure to object to the erroneous voir dire was not due to lack of awareness of the impropriety of the prosecutors' remarks, but rather due to failure to make timely objection," and points to his counsel's objection made as a "motion in limine" during voir dire. (Pet. Brief at 46-47). The state habeas court, commented, however, on the fact that the trial court understood counsel's objection and treated the objection as an objection to the line of questioning, regardless of the manner in which the objection was characterized. (SH Tr at 254-55 (#32-36)).

In reviewing these claims, the state habeas court specifically found that "the State established with each juror that the forty-year minimum period of incarceration for a life sentence would apply in this case," (SH Tr at 249 (#11)) commenting that "although the State told the jurors that the law may 'change,' except for one isolated comment to one juror, they did not say how the law might change and did not tell the jurors that it would change in a way that would allow earlier release on parole. In no case did the State invite the jury to speculate on the matter." (*Id.* (#12)). Ultimately, the state habeas court denied Hudson's ineffective assistance of counsel claim, finding that Hudson

had failed to meet the first prong of *Strickland*, which required that Hudson demonstrate deficient performance by his counsel in failing to object to the prosecution's parole remarks. (SH Tr at 255 (#32-36)).

A federal court may only grant habeas relief where a state court has already rejected an ineffective-assistance claim if the state court's decision was objectively unreasonable, that is, 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)).

At the outset, the Court notes that each of Hudson's claims for relief 4-8 is based on the premise that Hudson's trial counsel was ineffective for failing to object to conduct that he contends violated Texas law – thus the crux of Hudson's claims rests on his assertion that the State's comments to the jurors violated Texas law. (Pet. Brief at 45-46). In order to prevail on claims 4-7, Hudson must demonstrate that the state habeas court's decision that he did not satisfy the first prong of *Strickland* was contrary to, or an unreasonable application of, the standards provided by the clearly established federal law. But first Hudson must establish that his trial counsel's objections were meritorious under Texas law. His trial counsel's objections must have been sustainable had they been properly made. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir.1998) (holding that counsel's failure to make a frivolous objection is not unreasonable. Hudson has not and cannot meet this requirement. Accordingly, Hudson's fourth claim for relief is denied.

Hudson's fifth claim for relief is intertwined with the fourth and thus likewise fails. In his fifth claim for relief, he complains that he was denied affective assistance of counsel when his appellate counsel failed to raise the issue identified in Hudson's fourth claim on direct appeal. As

discussed previously, Hudson must first satisfy the two-pronged test set forth in *Strickland*. 466 U.S. at 677. Just as his trial counsel was not unreasonable for failing to lodge a frivolous objection, his appellate counsel was not ineffective for failing to raise an issue on appeal if that issue has not been shown to have merit. *See Smith v. Robbins*, 528 U.S. 259, 286 (2000) (applying *Strickland* test to claims for ineffective assistance of appellate counsel). Thus Hudson cannot meet the standards set forth in *Strickland* to demonstrate that his appellate counsel was ineffective for failing to raise this point of error, and accordingly, Hudson's claim five is denied.

In his sixth claim for relief, Hudson contends that the prosecution's statements regarding the parole laws deprived him of his rights under the Eighth and Fourteenth Amendments, resulting in fundamental error. Specifically, Hudson cites the prosecution's comments to twenty-three venire persons, nine of whom ultimately served as jurors in his case. Relying on *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion), Hudson argues that "fundamental fairness and the avoidance of cruel and unusual punishment dictates that jurors must consider and give weight to mitigating circumstances" (Pet. Brief at 51), and that his Fourteenth Amendment due process rights require specifically that "the jury be apprised accurately of the minimum length of time a defendant can be expected to be absent from society." (Pet. Brief at 51) (citing *Simmons* at 163-164). Hudson claims that "[t]he Court's instructions to the jury are effectively sabotaged when the State is permitted to undermine such instructions by representing to the jury that the minimum confinement mandated by law may not apply" to Hudson in future. (Pet. Brief at 51) (citing *Valencia v. State*, 946 S.W.2d 81 (Tex. Crim. App. 1997).

In essence, Hudson contends that *Simmons* mandates that the actual duration of the defendant's period of incarceration is necessarily relevant to the jury's determination of future

dangerousness; thus the State cannot be allowed to suggest that the 40-year minimum may never apply if Hudson received a life sentence.

During a lengthy voir dire explanation, the prosecution mentioned, *inter alia*, that the forty-year minimum Hudson would have to serve if given a life sentence was subject to change by the legislature. *See generally*, (CR at 17-32). The prosecution also instructed the jurors that they could not "compute or come up with when [Hudson] might get out" in answering the special issues because the length of time he may serve was in the province of the Board of Pardons & Paroles. (CR at 28).

Hudson asserts that "because the prosecutor's statements to juror's [sic] undermined the high degree of reliability required in death penalty cases, [Hudson] was deprived of 'a fair and impartial trial'" in violation of his Eighth and Fourteenth Amendment rights as set forth by the Supreme Court in *Simmons*. The Supreme Court in *Simmons*, did not address the Eighth Amendment issue, however, and only reached the issue of the due process clause of the Fourteenth Amendment. *Id.* at 162 n. 4.

The state habeas court specifically rejected the factual basis of Hudson's argument, finding that the prosecution's statements that parole law might change did not undermined the stated 40-year minimum. (SH Tr at 249 (#13)). The court specifically found that the State did not misstate the law when it commented that parole laws could change (*Id.* at 250 (#14). In a detailed analysis of the prosecution's comments and applicable state law, the state habeas court found that Hudson's claims were without merit. (SH Tr at 249-264). The court specifically noted that *Simmons* did not apply to Hudson's case because *Simmons* applies solely to defendants who are not eligible for parole, citing *Ramdass v. Angelone*, 530 U.S. 156 (2000) (plurality opinion), in which the Supreme Court

23

refused to extend *Simmons'* rationale to cases such as Hudson's, where the defendant would be eligible for parole. (SH Tr at 250 (#16-17)).

Importantly, Texas law on parole eligibility in cases such as Hudson's changed in September 2005. Effective September 1 of that year, any defendant found guilty of a capital felony in a case in which the prosecution seeks the death penalty is no longer entitled under Texas law to parole, if given a life sentence. *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp.2005). The Texas Code of Criminal Procedure was also amended to require courts to charge the jury in capital cases "that a defendant sentenced to confinement for life without parole under this article is ineligible for release from the department on parole." *Id.. See* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(2)(B) (Vernon Supp. 2005).

The Court must presume that the factual findings of the state habeas court are correct, and Hudson may only overcome this presumption with clear and convincing evidence. *See, e.g., Summers*, 431 F.3d at 868. Hudson has not meet this burden. Moreover, even if Hudson had met his burden of demonstrating clear error on the factual basis of his claim, the Court finds that the state habeas court did not unreasonably apply clearly established federal Supreme Court law in holding that *Simmons* does not apply in the instant case, in which Hudson would have been eligible for parole if given a life sentence, the Court finds that the state habeas court did not. Hudson's sixth claim for relief is therefore denied.

In his seventh claim for relief, Hudson claims that his appellate counsel's failure to raise the issue identified in claim six on appeal denied Hudson of effective assistance of counsel, depriving him of his Eighth and Fourteenth Amendment rights to such a degree that fundamental error occurred. As discussed previously in analyzing Hudson's fifth claim, Hudson must first satisfy the

two-pronged test set forth in *Strickland*. Again, just as his trial counsel was not unreasonable for failing to lodge a frivolous objection, Hudson's appellate counsel was not ineffective for failing to raise an issue on appeal if that issue has not been shown to have merit. *Smith*, 528 U.S. at 286. The Court has found that all of Hudson's claims regarding the prosecution's statements to the potential jurors regarding potential changes in parole laws and their affect on Hudson lack merit. Thus Hudson cannot meet the standards set forth in *Strickland* to demonstrate that his appellate counsel was ineffective for failing to raise this point of error, and accordingly, Hudson's claim seven is denied.

### E. Claims Regarding Allegedly Vague Terms in the Jury Charge (Claim #8).

Hudson's eighth claim alleges that he is entitled to habeas relief because the trial court's jury instructions at the punishment phase contained unconstitutionally vague terms in the special issues, in violation of his Sixth, Eighth, and Fourteenth Amendment rights. Hudson acknowledges that at the conclusion of the punishment phase of his trial, the trial court submitted to the jury the special issues statutorily mandated by the Texas Code of Criminal Procedure.

The special issues included:

> ISSUE NUMBER ONE: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

> ISSUE NUMBER TWO: Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

CR at 29-31; *see* TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 2(b)(1), (e)(1) (Vernon 1981 & Supp.2005).

Hudson claims that because the jury did not receive specific instructions regarding the meaning of the terms "probability", "criminal acts of violence" or "threat to society," "the trial court failed to charge the jury in a constitutionally adequate manner so that its determination are rationally reviewable." (Pet. Brief at 55). According to Hudson, the special issues functioned as aggravating circumstances because they "circumscribe[d] the class of persons eligible for the death penalty." (Pet. Brief at 56) (quoting *Zant v. Stephens*, 462 U.S. 862, 878 (1983)). Hudson relies upon the U.S. Supreme Court's decision in *Maynard v. Cartwright*, 486 U.S. 356 (1988) for the proposition that a death sentence may not be imposed using a vaguely defined aggravating factor unless that factor is accompanied by "a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope." (Pet. Brief at 56). Because the terms Hudson identifies do not, according to him, have a "common or uniform meaning," they "did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence." (Pet. Brief at 57-58) as required by the federal precedent set by the Supreme Court in *Maynard v. Cartwright*.

The U.S. Supreme Court has distinguished the eligibility phase of the capital punishment decision-making process from the selection phase. *See Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994). In *Tuilaepa*, the Court explaining that during the eligibility phase, the trier of fact must both "convict the defendant of murder" and must then also "find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* As the *Tuilaepa* Court explained, after the jury determines that the defendant falls within the category of those eligible for capital punishment, the jury then considers a number of factors to determine the appropriate punishment. *Id.* at 979 (citations omitted). In *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), the Supreme Court specifically noted

that its previous decisions "suggest that complete jury discretion is constitutionally permissible." Regarding the specific terms Hudson complains of, the Fifth Circuit has repeatedly found that they are not unconstitutionally vague and that their meaning may be readily understood. *See, e.g., Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993).

Hudson raised this issue in his direct appeal (Direct Appeal Brief at 113-17), and it was rejected by the Court of Criminal Appeals. *Hudson*, No. 73,826, slip op. at 21. Given the long line of Fifth Circuit precedents supporting this decision, it cannot be said that this decision denying this claim for relief is contrary to clearly established federal law. Accordingly, this claim is without merit, and it is denied.

### F. Texas Death Penalty Scheme Claim (Claim #9).

Hudson next alleges in his ninth claim that the trial court's instructions to the jury at the punishment phase of his trial was unconstitutional because, in conformity with the Texas Code of Criminal Procedure, the court's instructions did not inform jurors that their failure to reach a unanimous verdict on punishment would result in a life sentence, violating Hudson's Eighth and Fourteenth Amendment rights. Following the punishment phase of Hudson's trial, the trial court instructed the jury in accordance with TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 2(d)(2), (f)(2) ((Vernon 1981 & Supp.2005), which forbids the trial court, as well as the parties, counsel or any other person from informing the jury that their failure to reach a verdict results in a life sentence. The jurors in Hudson's case were required to answer two special issues pertaining to future dangerousness and to mitigation. The jurors were instructed that they could not answer the future dangerousness issue "yes" or the mitigation issue "no" unless all twelve jurors were unanimous in

that decision. They also were instructed that they could not answer the future dangerousness special issue "no" or the mitigation special issue "yes," unless at least ten jurors agreed with that answer, which would then result in a life sentence. (CR at 25). This is commonly known as the "12-10" rule. However, under Texas state law, if the jury fails to reach a decision regarding either special issue in a capital murder case, the defendant will receive a life sentence. By law, none of the parties are permitted to inform the jury this result should the jury fail to reach a verdict. TEX. CODE CRIM. PROC. ANN. art 37.071 § 2(a)(1), (g) (Vernon 1993).

Hudson argues that this law "in effect, spar[ing] the life of the accused," confuses jurors by failing to inform them that their answers to the verdict form can result in a life sentence in one of two ways – either by answering the special issues in a manner that results in a life sentence or by failing to reach a verdict at all. (Pet. Brief at 60). Hudson claims that this law violates the Eighth Amendment principles as set forth by the U.S. Supreme Court in *Mills v. Maryland*, 486 U.S. 367 (1988) by "leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist." (Pet Brief at 60) (citing *Mills* at 374).

Hudson also cites to *Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988), without further explanation. The *Lowenfield* citation Hudson relies upon discusses whether a supplemental jury instruction was coercive. But no supplemental jury instruction was given at Hudson's trial and Hudson gives no other reason for his citation, and so the Court declines to consider this citation further.

Hudson argues that "[u]nless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give a 'majority rules' mentality is too great under the

Eighth Amendment, particularly in a capital case." (Pet. Brief at 61). Hudson relies on *Kubat v. Thierot*, 867 F.2d 351, 369-73 (7th Cir.) for the proposition that not informing jurors of the effect of one juror's vote results in "a substantial probability that a juror might have been precluded from voting for mercy because of a mistaken belief that the sufficiency of mitigating factors must be shown." (Pet. Brief at 61).

The state habeas court rejected Hudson's claim. Distinguishing *Mills*, the court found that Hudson had not demonstrated that the Texas rule against informing jurors of the effect of a deadlocked jury was unconstitutional, and found that Hudson's due process rights under the Eighth Amendment had not been violated . (SH Tr at 334-35 (#305-310)). This Court finds that the state habeas court's application of Supreme Court precedent was not unreasonable.

In *Jones v. United States*, the Supreme Court addressed the question of whether a federal death penalty defendant's Eighth Amendment rights were violated because the jurors in his case were not given a jury instruction at the punishment phase of the trial regarding the consequences of a jury deadlock at punishment. Because *Jones* was a federal death penalty case, under the federal death penalty statute, the jury was required to consider all aggravating and mitigating factors and determine whether the aggravating factors outweighed the mitigating factors. All aggravating factors in a federal death penalty case must be proven beyond a reasonable doubt, whereas the jury may consider a mitigating circumstance so long as one juror finds that its existence has been established by a preponderance of the evidence. In *Jones*, the jury unanimously found the existence of two statutory and two non-statutory aggravating factors beyond a reasonable doubt and various jurors found the existence of ten mitigating factors. After weighing these factors, the jury unanimously recommended that Jones be sentenced to death. The jury did not receive an instruction requested

by the defense which informed the jurors that if they were unable to reach an unanimous decision with regard to the sentence to be imposed, the judge should be informed and would then impose a sentence of life imprisonment without possibility of parole. *Jones*, 527 U.S. at 376-80.

Although the Supreme Court in *Jones* acknowledged that it had previously held that a death sentence could not be imposed arbitrarily, that a jury must be given a vehicle in which all relevant mitigating evidence may be considered at the punishment phase of a capital murder trial, and that a jury cannot be affirmatively misled regarding its role in the sentencing process, the Court held that the Eighth Amendment was not violated simply because the jury was not informed of the consequences of a deadlock on the issue of punishment. Specifically, the Court held that the federal constitution was not violated because: 1) the jury in Jones' case was not misled about its role at punishment; 2) the object of the jury system is to secure unanimity by a dialogue among the jurors; and 3) in a capital sentencing proceeding the government has a strong interest in having the jury express the conscience of the community that might be undermined if the jury was informed about the consequences of a deadlock. *Id.* at 382. Moreover, although four justices dissented in *Jones* because they believed that an instruction regarding the effect of a jury deadlock was constitutionally required in the case, in the dissenting opinion authored by Justice Ginsburg, it is not disputed that the Eighth Amendment does not require that a jury be instructed as to the consequences of a failure to agree, but it is instead argued that such an instruction was necessary in *Jones* because of particular instructions given to the jury in that case which, the dissent argued, created a reasonable probability that the jurors in that case mistakenly believed that Jones could be sentenced to something less that life without parole for his crime. *Jones,* 527 U.S. at 418, n. 20. Because those instructions were peculiar to that case, both the majority and the dissenting opinions in *Jones* make clear that the

30

Supreme Court does not consider it a requirement of the Eighth Amendment that a capital jury be informed of the consequences of a failure to agree with respect to its verdict at the punishment phase of the trial.

Although *Jones* did not specifically address Hudson's Fourteenth Amendment claim, since *Jones* was handed down by the Supreme Court, the Fifth Circuit has held that an argument that the "12-10" rule in Texas violated a capital murder defendant's Eighth and Fourteenth Amendments was without merit. *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000). Moreover, the Fifth Circuit has also consistently held that any ruling that the "12-10" rule violated the federal constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), that did not place certain kinds of individual conduct beyond the power of the criminal law-making authority to proscribe and was not a watershed rule of criminal procedure, and therefore could not form the basis for federal habeas corpus relief. *See Hughes v. Dretke*, 412 F.3d 582, (th Cir. (Tex.) 2005); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993). Accordingly, this claim is without merit, and it is denied.

### G.    Claims Regarding the Jury Selection Process (Claim #10).

Hudson next asserts in claim ten that the Dallas County venire selection process violates his rights to an impartial jury consisting of a representative cross-section of the community under the Sixth and Fourteenth Amendments because Hispanics, persons 18 to 34 years old, and persons from households with incomes under $35,000 are under represented in the jury pool. (Pet. Brief at 62-63). The state habeas court declined to consider the merits of Hudson's tenth claim because he failed to

raise it at trial and, pursuant to the Texas contemporaneous objection rule found that he had procedurally defaulted. (SH Tr. at 336 (#314)).

When a claim has been dismissed by a state court pursuant to an independent and adequate state procedural rule, a federal district court may not engage in habeas review of that claim unless the prisoner can establish either (1) good cause for his default as well as actual prejudice that will result from the alleged violation of federal law *or* (2) that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 262 (1989). To satisfy these requirements, the state court's dismissal of the claim must "clearly and expressly" indicate that it rests on state grounds barring relief, and the bar must be one that is strictly and regularly followed by state courts applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995).

The state habeas court "clearly and expressly" declined to review Hudson's constitutional claim regarding the Dallas County venire selection process because of the contemporaneous objection rule. (SH Tr. at 336 (#314)). The state habeas court's discussion of the merits of Hudson's claim in the alternative has no affect on his ruling based on procedural grounds. *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005). Moreover, the Fifth Circuit has recognized that Texas' contemporaneous objection rule is well established, and that it has been "strictly or regularly followed." *Hogue v. Johnson*, 131 F.3d 466, 488 (5th Cir.1997); *see also Stokes v. Anderson*, 123 F.3d 858 (5th Cir. (Miss.) 1997) (discussing regularity requirement). Accordingly, the Texas contemporaneous objection rule constitutes an adequate and independent state ground that

procedurally bars federal habeas review of Hudson's claim. *See Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir.) (concluding same).

Under the precedent of this Circuit, this Hudson must demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law, or ... that failure to consider the claims will result in a fundamental miscarriage of justice" for this Court to review his tenth claim further. *Stokes*, 123 F.3d at 859. In order to meet his burden of showing cause, Hudson must show that an objective external factor kept his trial counsel from complying with the rule. *Meanes v. Johnson*, 138 F.3d 1007, 1011 (5th Cir. 1998) (citations omitted). In order to show prejudice, Hudson must prove that errors at his trial actually worked to his "substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis omitted). But Hudson does not allege, much less demonstrate, cause or prejudice. Nor does Hudson allege in the alternative that the Court's failure to consider his claims will result in a miscarriage of justice, which would require him to establish his "actual innocence," which he does attempt. *See Neville v. Dretke*, 423 F.3d 474, 480-81 (5th Cir.2005) (citing *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). Accordingly, the Court finds that Hudson's tenth claim is procedurally barred.

### H.      Cumulative Error Claim (Claim #11).

In his eleventh and final claim for relief, Hudson alleges that he is entitled to habeas relief based on the cumulative effect of all the constitutional violations alleged in his petition, which, taken together, have denied him due process of law in violation of the Fifth and Fourteenth Amendments, even if none of the events individually violated his rights. (Pet. Brief at 66- 67). Hudson relies upon the Fifth Circuit's decision in *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), in which the court

held that in order for a federal habeas petitioner to prevail on a claim of cumulative error at a state trial, he must establish that: 1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; 2) the errors were not procedurally defaulted for habeas purposes; and 3) the constitutional errors so infected the entire trial that the resulting conviction violates due process. *Id.* at 1458.

As this Court has held in this opinion, the claims raised by Hudson are without merit and therefore do not establish any constitutional errors which infected the trial such that Hudson's conviction and sentence violate his due process rights. The state habeas court also concluded that there was no cumulative error because Hudson had failed to establish any constitutional violations. (SH Tr at 342 (#347-47)). This conclusion is not contrary to federal law, and Hudson's eleventh claim for relief is therefore denied.

## IX. EVIDENTIARY HEARING

Hudson requested in the alternative that an evidentiary hearing be held to resolve any disputed fact issues. (Pet. Brief at 68). When the pleadings demonstrate a factual dispute, that, if resolved in Hudson's favor, would entitle him to relief and the state has not afforded him a full and fair evidentiary hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing. *See Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999). Since the pleadings demonstrate that there is no factual dispute upon which federal habeas corpus relief can be granted, no evidentiary hearing is warranted.

## X.  <u>CONCLUSION</u>

Hudson's petition for a writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED.**

**DATED: September 20th, 2007.**

_____
**ED KINKEADE**
**UNITED STATES DISTRICT JUDGE**